UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WASTE ACTION PROJECT, | CASE NO. 2:21-cv-00443-RAJ-GJL |
| Plaintiff, | REPORT AND RECOMMENDATION |
| v. | Noting Date: September 25, 2024 |
| GIRARD RESOURCES & RECYCLING LLC, | |
| Defendant. | |

The District Court has referred the parties' separate Motions for Summary Judgment (Dkts. 149, 155) to United States Magistrate Judge Grady J. Leupold pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), and local Magistrate Judge Rules MJR1 and MJR4.

Having reviewed the relevant record, and finding oral argument unnecessary, the Court concludes that Defendant indisputably violated the Clean Water Act ("CWA"). Based on a lack of material fact disputes, Plaintiff is entitled to judgment as a matter of law on a portion of the claims in its Amended Complaint, a total of 1,334 discrete CWA violations. The Court accordingly recommends Defendant's Motion for Summary Judgment (Dkt. 155) be **DENIED** and Plaintiff's Motion for Partial Summary Judgment (Dkt. 149) be **GRANTED**.

# I.    PROCEDURAL HISTORY

Plaintiff Waste Action Project ("Plaintiff" or "WAP") filed an Amended Complaint on July 24, 2023, alleging that Defendant Girard Resources & Recycling LLC ("Defendant" or "Girard") violated the CWA by (1) discharging pollutants without the required permit and (2) once it obtained permit coverage on March 2, 2023, violating the terms of that permit. Dkt. 66.

Plaintiff moved for Partial Summary Judgment on June 28, 2024, asking the Court to find Defendant liable for a portion of its CWA claims in the Amended Complaint. Dkt. 149. Defendant moved for Summary Judgment that same day, arguing that this matter should be dismissed for a lack of standing and subject matter jurisdiction. Dkt. 155. The parties submitted responsive briefs on July 19, 2024, and reply briefs on July 26, 2024. Dkts. 162, 164, 169, 170. Plaintiff submitted a Surreply Motion to Strike on July 30, 2024. Dkt. 171.

# II.    BACKGROUND

In support of their Motions, the parties have submitted thousands of pages of evidence for the Court's review. This evidence includes business records, permits, witness declarations, deposition transcripts, communications, photographs, and expert reports from both parties. Dkts. 149–59, 161–71. The Court has reviewed all arguments and evidence to determine which facts are agreed upon by the parties, and which are disputed.

## A.    Regulatory Framework

Congress enacted the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "A cornerstone of the [CWA] is that the 'discharge of any pollutant' from a 'point source' into navigable waters of the United States is unlawful[.]" *Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002) (quoting 33 U.S.C. §§ 1311(a)). However, a person or

company may obtain a National Pollutant Discharge Elimination System ("NPDES") permit—
which both authorizes and regulates the discharge of pollutants—from either the Environmental
Protection Agency ("EPA") or an approved state agency. *Id.*; 33 U.S.C. § 1342. The CWA
requires NPDES permits for stormwater discharges "associated with industrial activity." *Puget
Soundkeeper All. v. Rainier Petroleum Corp.*, No. C14-0829JLR, 2015 WL 13655379, at *2
(W.D. Wash. Dec. 16, 2015) (citing 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26).

 In Washington State, the Department of Ecology ("Ecology") is responsible for
administering the CWA's NPDES program. *Ass'n to Protect Hammersley*, 299 F.3d at 1009–10;
33 U.S.C. § 1342(b); Wash. Rev. Code § 90.48.260. Ecology implements the CWA's NPDES
program through the issuance of "general permits." *Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot.
Agency*, 344 F.3d 832, 853 (9th Cir. 2003). "A general permit is a tool by which EPA regulates a
large number of similar dischargers" by identifying "the output limitations and technology-based
requirements necessary to adequately protect water quality from a class of dischargers." *Id.*

 Relevant to this case is Ecology's Industrial Stormwater General Permit ("ISGP"). Dkt.
14-4. The ISGP requires the permit holder to establish a facility-specific Stormwater Pollution
Prevention Plan ("SWPPP"), implement stormwater best management practices ("BMPs"), and
collect, analyze, and report samples of stormwater discharge at designated discharge points. *Id.*
at 6–7; Dkt. 14-4.

**B.** **The Facility**

 Defendant leases an approximately four-acre property from the City of Snoqualmie in
Snoqualmie, Washington, that Defendant operates as a material recovery and recycling facility
(the "Facility"). Dkt. 165 at 2; Dkt. 167 at 1. There, Defendant processes waste concrete from
construction projects and uses street sweeping wastes from the City of Snoqualmie to create

1    compost. Dkt. 155 at 3; Dkt. 165 at 3. These wastes, along with recycled products resold to the

2    public for landscaping and construction, are stored on-site at the Facility. Dkt. 149-10 at 37–40;

3    Dkt. 150-2 at 11–12. The Facility sits above and adjacent to a creek that flows into the

4    Snoqualmie River across the street. *Id.* at 48–49; Dkt. 149-3 at 14–15; Dkt. 149-9 at 166.[1]

5    **C.    WAP and Wayne Russell**

6         Waste Action Project was founded in 1994 "to provide education and advocacy related to

7    water quality and toxics, and to restore and maintain the chemical, physical, and biological

8    integrity of the Nation's waters." Dkt. 80 at ¶ 10. Greg Wingard, Plaintiff's Executive Director,

9    describes Plaintiff as "a member-based and supported organization dedicated to the protection of

10   the natural environment and human health, particularly water quality" that uses community

11   organizing and litigation under the CWA to achieve its goals. *Id.* at ¶ 11–12.

12        Wayne Russell is a resident of Snoqualmie who lives 500 feet from the Snoqualmie River

13   and roughly a mile from the Facility. Dkt. 153 at 1–2. Mr. Russell testified that he recreates at

14   several locations around the Snoqualmie River, both downstream and upstream from the Facility.

15   *See* Dkt. 156 at 99, 125 (fishing and watching fish at Tokul Creek in 2018), 111 (viewing

16   wildlife at Centennial Fields Park and his home "all the time."). Russell submitted a Declaration

17   further detailing his activities downstream. *See* Dkt. 153 at 3 (describing (1) fishing and

18   observing salmon runs at the Raging River; (2) visiting Tokul Creek and speaking with

19   fishermen in February 2024, viewing wildlife there "hundreds of times over the years"; and (3)

20   watching for wildlife and eating at a restaurant in Falls City which "provides a nice view of the

21

22   _____

23   [1] The creek is divided into two sections, labelled "Unnamed Creek #1" and "Unnamed Creek #2" to the
     east/southeast of the Facility on the site map provided by Defendant for its current SWPPP. Dkt. 150-4. Plaintiff and
     its expert witness sometimes also refer to the creek as a "stream" or "stream tributary."  Dkt. 149 at 15, 16; Dkt.

24   151-1 at 29.

REPORT AND RECOMMENDATION - 4

river.").[2] Russell also described having a "strong religious connection to the Snoqualmie River" and frequently going to the banks of the River "to take a moment and pray and re[-]center [himself]." *Id.* at 5.

Russell drives alongside the Snoqualmie River "daily" and by the Facility "often." *Id.* at 2, 7. In 2019, Russell saw muddy water running down the driveway of the Facility and onto the street, where it flowed into the Snoqualmie River. *Id.* at 6 ("muddy water from Girard was going directly into the creek, and then flowing into the river"); Dkt. 162-1 at 8 (describing water from the facility "running down the road like in a stream."). Russell spoke with Monica Lowney in Snoqualmie and expressed concern about what he believed to be discharges of polluted water. Dkt. 156 at 104. Ms. Lowney discussed WAP with Russell and put him in contact with Greg Wingard. *Id.*

Mr. Wingard and Mr. Russell met in person for the first time in late 2019 or early 2020 when the two discussed Russell's concerns about pollution, drove around the Snoqualmie River, and viewed the outside of the Facility. *Id.* at 105–06. Wingard asked Russell if he wanted to become a member of WAP and testify against Defendant, and Russell agreed to both. *Id.*; Dkt. 80 at 6–7; Dkt. 153 at 5–7. Since then, Russell has continued to observe the Facility, including by photographing what Russell believed to be (1) foamy discharges by Defendant into the nearby creek in October 2020 and (2) an uncovered dumpster containing scrap metal in July 2023. Dkt. 153 at 7; Dkt. 162-1 at 7.

Russell believes he witnessed pollution from Defendant which harms wildlife in and around the Snoqualmie River. Dkt. 162-1 at 13–15. Russell reasoned that "if pollutants and foam

---

[2] Defendant argues that the Court should disregard the Russell Declaration because it contradicts his deposition testimony. Dkt. 164 at 15–20. As detailed further below, this Court finds no such contradiction and considers Russell's Declaration alongside his deposition testimony.

1  and that are going in, something has to be affected [. . . .] If water's draining from facilities that

2  are recycling materials that contain petroleum products, [that] pretty much would mean that there

3  has to be things that are not supposed to be going in the water." Dkt. 156 at 122–23. Russell

4  believes that this has adverse effects on fish, stated that "pollution makes fishing less peaceful

5  and less enjoyable[,]" and testified that he would go fishing more often "if some things were

6  maintained better as far as toxicity." *Id.* at 119; Dkt. 153 at 9; Dkt. 162-1 at 15. Aside from its

7  effects on fish, Russell stated that the pollution also distracts him and impedes his viewing of

8  wildlife and spiritual connection to the Snoqualmie River. Dkt. 153 at 8–9.

9  **D.    Pre-Permit Claims**

10  Plaintiff alleges that Defendant discharged a pollutant from the Facility without NPDES

11  permit authorization at least 29 times—once per calendar quarter between February 1, 2016, and

12  March 2, 2023, when Defendant obtained ISGP coverage. Dkt. 149 at 11.[3]

13  Plaintiff points to two discharge points identified by Defendant: DP-1, which receives

14  stormwater runoff from most of the Facility and discharges stormwater at its northeast corner

15  into an engineered wetland; and DP-2, which discharges from a smaller portion of the Facility

16  near the driveway and into the creek flowing into the Snoqualmie River about 150 feet away.

17  Dkt. 149 at 17–18; Dkt. 151-2 at 21; Dkt. 150-2 at 49. Plaintiff alleges that there were additional

18  discharge locations before improvements were made around June 5, 2023. Dkt. 149 at 19.

19  Plaintiff asserts that there is no material dispute that stormwater discharged from these

20  sources at least once per calendar quarter for roughly seven years. Dkt. 149 at 11–12. Plaintiff

21  notes that Defendant's employees testified that the Facility "discharged stormwater since at least

22

23

24

---

[3] Plaintiff asserts it will be able to prove additional unpermitted discharges at trial but moves for summary judgment only on these 29 "undisputed" discharges. Dkt. 149 at 11, n.8.

2014 to an off-site wetland and to a roadside ditch," and that Defendant's expert witness opined that the Facility discharged "at least once per quarter" as long as the Facility was in operation. *Id*. at 12 (citing Dkt. 149-8 at 42; Dkt. 149-9 at 28–31). According to Plaintiff, this discharge frequency is further supported by post-permit samples showing a discharge at least once every quarter—without any changes "made to the topography of the site that would indicate discharges were less frequent in the past." *Id.* at 13. Plaintiff claims that each of these 29 pre-permit discharges is a violation under the CWA for which it is entitled to summary judgment. *Id.* at 11.

**E.    Post-Permit Claims**

Defendant obtained an ISGP on March 2, 2023. Dkt. 158 at 9. Plaintiff alleges that Defendant has since violated the terms of its ISGP and moves for summary judgment on several categories of violations. Dkt. 149 at 20–36.

**1.    SWPPP Deficiencies**

Plaintiff alleges that Defendant has failed to develop and incorporate an SWPPP compliant with the ISGP's requirements. Dkt. 149 at 20–27. Plaintiff depicts a timeline of three categories of violations:

First, Plaintiff asserts that Defendant was required to establish an SWPPP "immediately" upon receipt of its ISGP and its failure to do so from March 2, 2023, through July 19, 2023, is a violation of the ISGP and, by extension, the CWA. *Id.* at 21.

Second, Plaintiff asserts that Defendant's first SWPPP, prepared on July 20, 2023, and effective through December 7, 2023, contained several deficiencies in its map of the Facility. *Id.* at 21–24. Specifically, Plaintiff asserts that Defendant failed to include the locations of all impervious surfaces, structural source control BMPs, drainage ditches, onsite stormwater

conveyances, actual and potential pollutant sources, and a correct location for sample point DP-2. *Id.*

Third, Plaintiff asserts that Defendant's second SWPPP, prepared on December 8, 2023, and presently in effect, contains further deficiencies in its site map and descriptions of BMPs. *Id.* at 24–27.

Plaintiff argues that Defendant should be liable for one violation of the CWA for every day that its SWPPP was nonexistent or deficient. *Id.* at 20.

**2.    Slurry Processing Embankment**

Plaintiff alleges several ISGP violations with respect to the "slurry processing embankment." Dkt. 149 at 28–33. This embankment sits above the stream that borders the Facility and flows into the Snoqualmie River, and, according to Plaintiff, is treated "as an extension of its slurry processing area," where workers process slurry-related solids from a containment area and store slurry processing equipment. *Id.* at 28–29. Plaintiff alleges that Defendant has failed to implement its ISGP on the embankment, resulting in SWPPP, BMP, and monitoring and sampling violations.

**3.    BMP Deficiencies**

Plaintiff asserts that Defendant has failed to incorporate certain BMPs required by its ISGP. Dkt. 149 at 33. These include BMPs for erosion and sediment control, storm-resistant lidded dumpsters, track-out caused by trucks leaving the Facility, the prevention of highly turbid discharges, and solid waste handling and dumping. *Id.* at 33–36.

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### III.    MOTIONS TO STRIKE

Although Plaintiff has not filed separate Motions to Strike, the Court takes note of several requests to strike portions of Defendant's briefs and evidence. First, Plaintiff requests that the Declaration of Harold Ruppert (Dkt. 157) be stricken for Defendant's failure to disclose Ruppert as an expert where his Declaration "purports to improperly provide opinions based on specialized knowledge." Dkt. 162 at 35 (citing Fed. R. Evid. 701(c)). Defendant posits that Ruppert is not testifying as an expert, but only about his advice while working as a consultant to Defendant between 2012 and 2017, "which bears on whether Girard knew it needed an NPDES permit at the time as alleged by WAP." Dkt. 169 at 18. Although Defendant's knowledge of a permit requirement is not an element of CWA liability,[4] the Court has reviewed the Ruppert Declaration and finds it to be a proper declaration from a lay witness. No expert disclosure was required, and the Court **DENIES** Plaintiff's Motion to Strike the Ruppert Declaration (Dkt. 162 at 35).

Second, in its Surreply, Plaintiff requests under Local Rule 7(g) that several "misrepresentations" in Defendant's Reply be stricken. Dkt. 171 at 1 (citing Dkt. 169). These include:

(1)    Statements regarding the application of *Citizens for a Better Env't-California v. Union Oil Co. of California* ("*UNOCAL*"),[5] including the statement that only one court has ever cited the case's discussion of anticipatory CWA notices;

---

[4] The CWA "imposes strict liability for NPDES violations." *Inland Empire Waterkeeper v. Corona Clay Co*, No. SACV180333DOCDFMX, 2019 WL 4233584, at *1 (C.D. Cal. June 10, 2019) (quoting *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 919 (C.D. Cal. 2009)).

[5] 861 F. Supp. 889 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111 (9th Cir. 1996), *as amended* (July 16, 1996).

(2)      Statements about the Ninth Circuit's reversal of an opinion from this District in *Soundkeeper v. Port of Tacoma*,[6] including the statement that the Ninth Circuit left untouched the District Court's finding that an anticipatory notice letter was invalid; and

(3)      Statements that Wingard shares attorney fees from Plaintiff's CWA suits in violation of RPC 5.4.

Dkt. 171 at 2–4.

Although Plaintiff is free to argue that Defendant has mischaracterized case law, the Court **DENIES** Plaintiff's Surreply Motion to Strike (Dkt. 171) with respect to the first two arguments. Any misstatements about the facts and holdings in *UNOCAL* and *Port of Tacoma* are not so egregious and directly contradictory as to warrant striking them from the record. *But see Inland Nw. Renal Care Grp., LLC v. WebTPA Emp. Servs., LLC*, No. C19-1758-JCC-SKV, 2022 WL 18999836, at \*12 (W.D. Wash. Dec. 29, 2022), *report and recommendation adopted*, No. C19-1758-JCC-SKV, 2023 WL 2042174 (W.D. Wash. Feb. 16, 2023) (striking a filing that quoted a party's brief from another case, where the quoted argument was directly rejected by the court in the cited case). The Court can adequately review the accuracy of Defendant's citations and has done so here. *See Bishop v. Children's Ctr. for Developmental Enrichment*, No. 2:08-CV-766, 2011 WL 5506105, at \*2 (S.D. Ohio Nov. 10, 2011) (denying a motion to strike, noting, "[t]his Court is in the business of determining whether the litigants before it appropriately relate the facts, the other parties' arguments, and the propositions that are set forth in case law or whether the litigants mischaracterize those facts, arguments, and propositions.").

---

[6] No. 21-35881, 2023 WL 11807235, at \*3 (9th Cir. June 10, 2024). For the District Court ruling, *see Puget Soundkeeper All. v. APM Terminals Tacoma, LLC*, No. C17-5016 BHS, 2019 WL 399026 (W.D. Wash. Jan. 31, 2019).

However, the Court **GRANTS** Plaintiff's Surreply Motion to Strike (Dkt. 171) with respect to its third argument. This Court has already rejected Defendant's assertion that Wingard's fee arrangement is suspect under RPC 5.4 and has stricken evidence submitted in support of that argument. Dkt. 91 at 2, 5–7. The Court will **STRIKE** and will not consider the relevant language in Defendant's Reply. Dkt. 171 at 4 (quoting Dkt. 169 at 3).

## IV.    STANDARD OF REVIEW

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute over the material facts before the court and the moving party is entitled to judgment as a matter of law. *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1136 (9th Cir. 1975), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990). Summary judgment is proper only if the pleadings, discovery, and disclosure materials on file, and any affidavits, show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e).

Where there is a complete failure of proof concerning an essential element of the non-moving party's case on which the nonmoving party has the burden of proof, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*

*Corp.*, 477 U.S. at 323; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) ("the judge must view the evidence presented through the prism of the substantive evidentiary burden"). However, when presented with a motion for summary judgment, the court shall review the pleadings and evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 (internal citation omitted).

The opposing party cannot rest solely on its pleadings but must produce significant, probative evidence in the form of affidavits, and/or admissible discovery material that would allow a reasonable jury to find in its favor. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, n.11 (citing Rule 56(e)); *Anderson*, 477 U.S. at 249-50. In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). However, weighing of evidence and drawing legitimate inferences from facts are jury functions, and not the function of the court. *See United Steel Workers of America v. Phelps Dodge Corps.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

When parties file cross-motions for summary judgment, as the parties have done here, each motion "must be considered on its own merits." *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The court must review the evidence submitted in support of each cross-motion. *Id*. And, although the parties may each assert there are no uncontested issues of material fact, the Court must determine whether disputed issues of material fact are present. *Id*.; *Osborn v. Butler*, 712 F. Supp. 2d 1134, 1148 (D. Idaho 2010).

//

//

# V.    DISCUSSION

In its Motion for Summary Judgment, Defendant argues that Plaintiff lacks standing because it is not a membership organization and, even if were, its member standee has suffered no injury fairly traceable to Defendant's activities. Dkt. 155 at 20. Defendant also argues that Plaintiff's 60-day notice of CWA violations was defective, depriving this Court of subject matter jurisdiction. *Id.*

In Plaintiff's Motion for Partial Summary Judgment, Plaintiff argues that there is no material dispute of fact concerning either standing or the Court's jurisdiction and that Defendant violated the CWA by first (1) discharging a pollutant—stormwater associated with industrial activity—into waters of the United States without a permit, then by (2) violating the terms of the permit it obtained on March 2, 2023. Dkt. 149 at 11–44.

This Court will first address the threshold issues of standing and jurisdiction raised by both parties.

## A.    Standing

The CWA "explicitly allows private citizens to bring enforcement actions against any person alleged to be in violation of federal pollution control requirements," including the conditions of an NPDES permit. *Ass'n to Protect Hammersley*, 299 F.3d at 1012; 33 U.S.C. §§ 1365(a) and (f); *see also Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("The plain language of CWA § 505 authorizes citizens to enforce *all* permit conditions.") (emphasis in original). In order to maintain a citizen suit, the plaintiff must have standing and provide the defendant(s) with pre-suit notice. 40 C.F.R. § 135.2; *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 174–175 (2000). Additionally, the

alleged violations must be ongoing. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 64 (1987).

Article III of the United States Constitution requires that a plaintiff show (1) it has suffered an "injury in fact"; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Laidlaw*, 528 U.S. at 180 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–51 (1992)). An organization has standing to sue on behalf of its members if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181. Defendant argues that Plaintiff lacks standing because (1) it is not a membership organization and (2) even if it were, the member-standee it is suing on behalf of (Mr. Russell) has not suffered an injury sufficient to satisfy the 3-part standing requirement under Article III. Dkt. 155 at 1–2. Conversely, Plaintiff argues that the Court should find standing so that it may grant summary judgment in its favor. Dkt. 149 at 10. The Court addresses these arguments below.

### 1.    Plaintiff's Status as a Membership Organization

Plaintiff WAP maintains that it is a membership organization and relies upon injuries to its member, Wayne Russell, to establish standing. Dkt. 149 at 10; Dkt. 162 at 16–19. Defendant asserts that WAP "is not a legally cognizable membership organization and, accordingly, by law has no 'members' to represent." Dkt. 155 at 1. Defendant argues that although Russell may believe he is a member of WAP, "he admits that he never filled out an application to become a member, and in fact never submitted any paperwork at all. He has not made any financial contribution to WAP and has never been asked to do so. He has not attended and is unaware of

1   any meetings of WAP members, has never voted for WAP's leadership [and] does not believe he

2   has any right to." *Id.* at 7. Plaintiff counters that it is a membership organization and Russell is a

3   member, irrespective of such facts. This Court agrees. Dkt. 162 at 16–18.

4       As this Court found in its February 12, 2024, Discovery Order, the intense scrutiny

5   requested by Defendant is at odds with the Supreme Court's decision in *Students for Fair*

6   *Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) ("*SFFA*"), which

7   requires only that an organization has identified members and represents them in good faith. Dkt.

8   91 at 7–8. This Court declined to apply the "indicia of membership" test suggested by Defendant

9   because WAP "is indisputably a voluntary membership organization with identifiable

10  members[.]" *Id.* at 8 (quoting *SFFA*, 600 U.S. at 201).

11      Plaintiff WAP's explicit purpose is to litigate citizen suits under the CWA. Dkt. 80 at 5,

12  8; Dkt. 153 at 6. It recruits members like Russell so that their injuries may serve as the basis for

13  citizen suits. *Id.* at 5–7; Dkt. 156 at 105, 113. The fact that Defendant finds this arrangement

14  unconventional and believes it to be invalid under state law is irrelevant. Dkt. 91 at 7–8. WAP's

15  structure is clearly sufficient to establish standing pursuant to *SFFA*.

16      Nevertheless, Russell is a voluntary WAP member, supports its mission, receives case

17  updates from WAP, and participates in case-related discussions and decisions. Dkt. 153 at 7–8;

18  *SFFA*, 600 U.S. at 200. Russell's WAP membership is more than sufficient to meet the

19  organizational and member nexus to satisfy standing.

20      **2.**    **Article III Requirements and Mr. Russell's Injury**

21          **a.**    **Injury in Fact**

22      The injury in fact requirement in environmental cases is satisfied if an individual shows

23  an (1) aesthetic or recreational interest in a particular place or animal or plant species and (2) that

24

those interests are impaired by reasonable concerns over a defendant's conduct. *Ecological Rights Foundation v. Pac. Lumber Co.*, 230 F.3d 1141, 1147, 1151 (9th Cir. 2000). A plaintiff is not required to "show there has been actual environmental harm." *Id.* at 1151.

Defendant argues that any harm to Russell is merely speculative and any reduction in Russell's activities was because "he *assumed* that discharges from Girard's facility were causing water quality violations in the Snoqualmie River" and "there is no sampling data to support his subjective concern." Dkt. 155 at 25–28. Defendant also notes that Russell testified he stopped fishing in part because of reasons unrelated to pollution, such as the death of his wife and his son moving out of state. Dkt. 155 at 28–29 (citing Dkt. 156 at 105–26). Russell has not fished in the Snoqualmie River in several years. Dkt. 153 at 3–4. Defendant notes that Russell did not have a fishing license in 2020 and 2021 but "purchased a fishing license five days after his deposition." Dkt. 155 at 8.

According to Defendant, these facts show that (1) Russell has no aesthetic or recreational interest in the Snoqualmie River, and (2) Russell's environmental concerns are speculative and unreasonable, undermining Plaintiff's standing. *Id.* (citing *Laidlaw*, 528 U.S. at 180).

First, Russell clearly has an "aesthetic or recreational interest" in the Snoqualmie River. *Pac. Lumber*, 230 F.3d at 1147. Indeed, Russell need only show a sufficient connection to the River to "make credible the contention that [his] future life will be less enjoyable [. . .] if the area in question remains or becomes environmentally degraded." *California Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1146 (E.D. Cal. 2016) (quoting *Pac. Lumber*, 230 F.3d at 1147).

Russell has lived in Snoqualmie since 1984, and currently resides 500 feet from the Snoqualmie River. Dkt. 153 at 1. Russell regularly visits the River to observe wildlife and pray,

1    doing so "hundreds of times over the years." *Id.* at 1–5; Dkt. 162 at 125; Dkt. 162-1 at 17.

2    Russell frequently fished at the River until the death of his wife in 2019, and he intends to fish at

3    the River again in 2024. Dkt. 153 at 3; Dkt. 162-1 at 12.

4         Courts in this Circuit have consistently found similar facts sufficient to establish an

5    aesthetic or recreational interest. *See, e.g., Waste Action Project v. Draper Valley Holdings LLC*,

6    49 F. Supp. 3d 799, 803 (W.D. Wash. 2014) (plaintiff's member lived within sight of the river

7    and used it for "spiritual renewal, recreation, bird-watching, and aesthetic enjoyment"); *Oregon*

8    *Nat. Desert Ass'n v. Cain*, 17 F. Supp. 3d 1037, 1050 (D. Or. 2014) (member previously visited

9    an affected area and indicated he intended to visit again "by the end of next year"); *Gescheidt v.*

10   *Haaland*, No. 21-CV-04734-HSG, 2023 WL 2250268, at *8 (N.D. Cal. Feb. 27, 2023) (plaintiff

11   visited park an average of six times per year for at least twenty-four years); *Cascadia Wildlands*

12   *v. Scott Timber Co.*, No. 6:16-CV-01710-AA, 2018 WL 3614202, at *11 (D. Or. July 27, 2018)

13   (member's attempts to observe affected bird "once per year over a fifteen-year period" were of a

14   "casual nature" but sufficient for standing).

15        Additionally, frequency of use may be a less important factor where an individual lives in

16   close geographical proximity to the area in question. *Pac. Lumber Co.*, 230 F.3d at 1149.

17   Russell's proximity to the River weighs heavily in Plaintiff's favor here and, when combined

18   with his historic and planned fishing at the River and his frequent and continuing use of the

19   River for other recreational activities, demonstrates a sufficient interest in the River for standing

20   purposes.

21        Second, Russell's concerns about Defendant's impact on the Snoqualmie River are

22   reasonable. Russell observed muddy water flowing from the Facility onto the road, a foamy

23   discharge "building up just below one of the points where Girard discharges into [the creek,]"

24

REPORT AND RECOMMENDATION - 17

1    and an open dumpster with scrap metal in it. Dkt. 153 at 6–7; Dkt. 162-1 at 8. Russell testified

2    during his deposition that, although he was not an expert, he believed his observations were

3    evidence of Defendant's pollution. *See* Dkt. 162-1 at 15 ("Partly the foam that was on the creek

4    [. . .] the only facility that can discharge to that creek is Girard [. . .] Because if you go upstream,

5    as I said before, there's wetlands there that are stagnant, and there's nothing there other than

6    [DirtFish Rally School]"); Dkt. 156 at 123 ("If water's draining from facilities that are recycling

7    materials that contain petroleum products, [such a discharge] pretty much would mean there has

8    to be things that are not supposed to be going into the water").

9        Defendant argues that Russell has "no factual basis" to support his concern and "thinks

10   the fish in the Snoqualmie River remain safe to eat." Dkt. 155 at 8. At the time of his deposition,

11   Russell had "zero knowledge about Girard's discharges, what they contained, whether they were

12   making their way to the Snoqualmie River, and whether they were causing any harm to the

13   environment." *Id.* at 29.

14       The "threshold question" of standing is "whether an individual can show that [he] has

15   been injured in [his] use of a particular area because of concerns about violations of

16   environmental laws, not whether the [he] can show there has been actual environmental harm."

17   *California Sportfishing Prot. All.*, 205 F. Supp. 3d at 1147 (quoting *Pac. Lumber*, 230 F.3d at

18   1151).

19       From his observations, Russell reasonably concluded that pollutants from Defendant

20   flowed into the adjacent creek and the Snoqualmie River across the street. This concern

21   diminishes his enjoyment of the River. Dkt. 156 at 119; Dkt. 153 at 9.[7] Nothing more is required

22

23   [7] Defendant argues that the Russell Declaration should be stricken as a "sham affidavit" because Russell's
     deposition testimony contradicts statements in the Declaration. Dkt. 164 at 15–23 (citing *Yeager v. Bowlin*, 693 F.3d

24   1076, 1080 (9th Cir. 2012)). Of the twelve statements identified by Defendants in the Declaration, however, none of

1  under the law. *See Californians for Alternatives to Toxics v. Schneider Dock & Intermodal*

2  *Facility, Inc.*, 374 F. Supp. 3d 897, 908 (N.D. Cal. 2019) ("But it is no answer to 'challenge as

3  implausible the notion that polluted stormwater from the [SDIF] facility could possibly have an

4  environmental impact on a body of water as large as [Humboldt] Bay.' Rather, '[w]hether that

5  inflow of pollutants from [the SDIF] facility is actually significant enough to harm the affected

6  area is a merits question, not a standing question'") (quoting *Ecological Rights Found. v. Pac.*

7  *Gas & Elec. Co.*, 874 F.3d 1083, 1093 (9th Cir. 2017)).

8          **b.    Injury "Fairly Traceable" to Defendant**

9          Defendant also challenges Plaintiff's standing by arguing that any injury to Russell is not

10  fairly traceable to Defendant's conduct. Dkt. 155 at 27; Dkt. 169 at 8–11. Again, Defendant

11  argues that Russell "has zero evidence [. . .] to support his subjective belief that Girard's

12  activities were actually harming his recreational and aesthetic interests in the Snoqualmie River."

13  *Id.* at 9. Defendant also argues that Plaintiff has no evidence of a "continuous surface

14  connection" between Girard's stormwater discharges and a water of the United States. Dkt. 169

15  at 11 (citing *Sackett v. EPA*, 598 U.S. 651 (2023)).

16          As discussed above, Russell has testified and averred in a Declaration that he observed

17  water running out of the Facility and into a nearby creek that flows into the Snoqualmie River.

18  Dkt. 153 at 6–7; Dkt. 156 at 123; Dkt. 162-1 at 8. Russell then reasonably concluded that this

19  water was polluting the Snoqualmie River, and his enjoyment of activities involving the River

20  was reduced. Dkt. 153 at 9; Dkt. 156 at 119. This is sufficient to show a "substantial likelihood"

21

22  these truly contradict Russell's testimony. *Id.* at 15–19. For example, Russell averred that he "saw foam building up
    just below one of the points where Girard discharges into it." Dkt. 153 at 7. This does not contradict his testimony

23  that water came from the Facility "where their entrance and the gates are" but that he had only ever observed the
    outside of the facility, had not seen the actual source of the water within the Facility, and did not truly know where

24  the foam came from. Dkt. 166 at 148, 159–60.

1    that Defendant caused the harm at issue. *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F.

2    Supp. 2d 863, 878 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012).

3                    **c.    Redress from Favorable Decision**

4            An additional requirement to standing is that Plaintiff's injury will be redressed by a

5    favorable decision. *Laidlaw*, 528 U.S. at 180. The Amended Complaint seeks an injunction to

6    remediate the alleged harm, which the CWA authorizes a federal court to issue, *see* 33 U.S.C. §

7    1365(a), (d), thereby satisfying the redressability requirement. Dkt. 66 at 1, 12; *Inland Empire*

8    *Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 832 (9th Cir. 2021) (citing *Nat. Res. Def.*

9    *Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000) (redressability is established

10   when a CWA citizen suit seeks injunctive relief)).

11   **B.    CWA Notice Requirement and Subject Matter Jurisdiction**

12           In addition to the standing requirements discussed above, the parties also dispute whether

13   Plaintiff has met the CWA's 60-day notice requirement. Dkt. 155 at 21.

14           A CWA citizen-plaintiff seeking to file a complaint in federal court must give a 60-day

15   notice of its intent to sue under 33 U.S.C. § 1365(b). *See Ctr. For Biological Diversity v. Marina*

16   *Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009). Notice is required for the Court's subject

17   matter jurisdiction. *See Sw. Marine*, 236 F.3d at 997 ("Subject matter jurisdiction is established

18   by providing a notice that is adequate on the date it is given to the defendant."). The purpose of

19   the notice requirement is to give the alleged violator "opportunity to bring itself into complete

20   compliance with the [CWA] and thus likewise render unnecessary a citizen suit." *Marina Point*,

21   566 F.3d at 800 (quoting *Gwaltney*, 484 U.S. at 60).

22           Defendant argues that Plaintiff's Second Notice of Intent to Sue ("Notice") and the

23   Amended Complaint do not contain good-faith allegations of continuing violations. *Id.*

24

1    Specifically, Defendant asserts that (1) claims about monitoring, sampling, and reporting are

2    "anticipatory" because they were noticed six weeks before Defendant was required to "conduct

3    stormwater sampling, analyze the samples, and report the results to ecology" under its newly-

4    held permit; (2) "SWPPP based allegations" are "wholly past" because Girard had prepared a

5    SWPPP and was compliant with the CWA prior to the filing of the Amended Complaint; and (3)

6    all remaining claims fail the good faith requirement because they "are solely based on

7    speculation and conjecture without any factual basis." Dkt. 155 at 31.

8         **1.    "Anticipatory" Claims**

9         Courts have found various notices of anticipated or future violations to be invalid. *See*

10   *Friends of Animals v. Ashe*, 51 F. Supp. 3d 77, 84 (D.D.C. 2014), *aff'd*, 808 F.3d 900 (D.C. Cir.

11   2015) (a "particularly common pitfall" of the notice requirement is providing "pre-violation

12   notice" of an impending violation); *see Kern Cnty. Farm Bureau v. Badgley*, No. CVF 025376

13   AWI DLB, 2002 WL 34236869, at *13 (E.D. Cal. Oct. 10, 2002) ("the fact that a premature

14   notice forecasts a violation that actually appears in a final rule promulgated by the Secretary does

15   not change the fact that one cannot give notice of a violation which has not yet happened.").

16        Defendant posits that the monitoring and reporting violations alleged in the Notice[8] were

17   anticipatory because Plaintiff issued the Notice on May 22, 2023, six weeks prior to August 15,

18   2023, the first due date for Defendant to report monitoring results to Ecology under its ISGP.

19   Dkt. 155 at 31 (citing Dkt. 167 at 7). Defendant asks this Court to find such a notice invalid. *Id.*

20   at 29–31.

21        Plaintiff counters with several cases from this Circuit which hold that an anticipatory

22   notice of CWA violations is "valid and effective[.]" Dkt. 162 at 27–28 (citing *UNOCAL,* 861 F.

23   ─────────────────────

24   [8] Dkt. 66-2 at 7–8.

Supp. at 889; *Puget Soundkeeper All. v. APM Terminals Tacoma, LLC*, No. C17-5016 BHS, 2018 WL 2560995, at *7 (W.D. Wash. June 4, 2018), *aff'd sub nom. Soundkeeper v. Port of Tacoma*, No. 21-35881, 2023 WL 11807235 (9th Cir. June 10, 2024).

Although the parties focus on the split in legal authority, it is not clear that the monitoring and reporting allegations in the Notice are truly anticipatory. Defendant was required to begin monitoring during the second reporting period (April-June) of 2023, and August 15, 2023, is merely the date by which Defendant was required to report its results. Dkt. 158 at 9. If Defendant failed to perform any monitoring during the entire period, it could not miraculously satisfy its ISGP obligations on August 15, 2023.

As a more specific example, the Notice alleges that Defendant failed to conduct monthly inspections of the Facility pursuant to Conditions S7.A and B of the ISGP. Dkt. 66-2 at 8; *see* Dkt. 14-4 at 45. When Plaintiff submitted its Notice on May 22, 2023, Defendant was already required to have performed one such inspection. If Plaintiff had a good-faith belief that Defendant failed to properly inspect the Facility during April 2023, Plaintiff was not required to wait until Defendant's reporting deadline to submit its Notice.

To the extent that any other alleged violations are indeed anticipatory, this fact does not doom Plaintiff's Notice. This Court finds persuasive the authority submitted by Plaintiff that anticipatory violations of CWA violations may be sufficient to satisfy the notice requirement. Dkt. 162 at 27–28 (citing *APM Terminals Tacoma*, 2018 WL 2560995, at *7; *Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1155 (9th Cir. 2024)). This is especially true where, as here, a detailed Notice provides sufficient information for Defendant to "attempt to abate the violation." *Scott Timber*, 105 F.4th at 1154. Defendant's behavior confirms this, as it made efforts after receiving the Notice to bring the Facility "into compliance by the end of the

1   60-day notice period." Dkt. 149-8 at 17; *see Scott Timber*, 105 F.4th at 1154–55 (courts may

2   review the defendant's behavior to determine whether it "understood or reasonably should have

3   understood the alleged violations" in the notice) (quoting *Klamath-Siskiyou Wildlands Ctr. v.*

4   *MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015)).

5          **2.      "Wholly Past" Claims**

6          Defendant asserts that Plaintiff's SWPPP allegations are "wholly past" because

7   Defendant responded to the Notice by obtaining a SWPPP before Plaintiff's filing of the

8   Amended Complaint. Dkt. 155 at 33 (citing *Gwaltney*, 484 U.S. at 52 (the CWA does not confer

9   federal jurisdiction over citizen suits for "wholly past" violations). Defendant argues that the

10  Court lacks subject matter jurisdiction because the Amended Complaint contains stale claims,

11  including that Defendant had no SWPPP at all until July 2023. *Id.* at 31–33; *see California*

12  *Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 124 F. Supp. 3d 1007, 1023 (E.D. Cal. 2015*),*

13  *on reconsideration in part*, No. 2:10-CV-01207-GEB-AC, 2016 WL 30000 (E.D. Cal. Jan. 4,

14  2016) ("Since the uncontroverted facts evince that Defendants created a SWPPP prior to Plaintiff

15  initiating this lawsuit, Plaintiff's claim against Defendants for failing to create a SWPPP alleges a

16  'wholly past violation' for which a citizen-plaintiff cannot sue.").

17         The purpose of *Gwaltney*'s mootness doctrine is to protect defendants "from the

18  maintenance of suit under the [CWA] based solely on violations wholly unconnected to any

19  present or future wrongdoing," while also protecting "plaintiffs from defendants who *seek to*

20  *evade sanction by predictable protestations of repentance and reform*." 484 U.S. at 66–67

21  (emphasis added) (quotations and citations omitted). *Gwaltney* does not bar suits over past CWA

22  violations, so long as the plaintiff also makes good-faith allegations of a "continuous or

23

24

REPORT AND RECOMMENDATION - 23

1    intermittent violation." 484 U.S. at 64.[9] Defendant has clearly attempted to rectify and address

2    some of Plaintiff's claims, including by establishing an SWPPP. Dkt. 164 at 14–15. The Court

3    maintains jurisdiction over past SWPPP violations, however, because Plaintiff alleges continuous

4    violations regarding the adequacy of the SWPPP. Dkt. 66 at 9–10; *but see Waste Action Project*

5    *v. Port of Olympia*, No. C17-5445 BHS, 2019 WL 6215281, at *9 (W.D. Wash. Nov. 21, 2019)

6    (granting summary judgment against defendant for SWPPP map violations but denying it for

7    "wholly past" claims unrelated to the SWPPP which predated the complaint).

8        Similarly, Defendant argues that claims regarding adequacy of the SWPPP were

9    improperly noticed. Dkt. 155 at 34–35. Defendant compares this case to *Long v. KZF Dev.*, 935

10   F. Supp. 2d 889 (N.D. Ill. 2013). The plaintiffs in *Long* alleged in their notice that the defendants

11   discharged stormwater without an SWPPP. *Id*. at 893. Defendants obtained an SWPPP after

12   receiving the notice. *Id.* Without issuing a new notice, plaintiffs then filed a complaint alleging

13   that the defendants' SWPPP was insufficient. *Id.* The Court held that the plaintiffs failed to

14   provide proper notice of the new claims. *Id.* at 896. Defendant points to *Long* to argue that the

15   Court should dismiss the claims of SWPPP inadequacy here for the same reason. Dkt. 155 at 34–

16   35.

17       However, the Ninth Circuit does not require plaintiffs to issue a new notice in such

18   situations:

19           If a defendant receives a proper notice letter alleging that it has failed to prepare
20           and implement an adequate plan and, in response, prepares a new plan and begins
             to implement it before the complaint is filed, is the otherwise proper notice letter
21           defective for failing to identify and discuss the new plan and its implementation?
             In those circumstances, must a citizen-plaintiff send a new notice letter? We think

22

23   _____
     [9] By the same token, "a court cannot impose penalties on a CWA defendant at summary judgment for past
     violations, unless the plaintiff also carries its burden to show ongoing violations." *Schneider Dock*, 374 F. Supp. 3d
24   at 911.

not. Subject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant.

*Sw. Marine, Inc.*, 236 F.3d at 997; *See Waterkeepers N. California v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 920 (9th Cir. 2004) (new notice not required where the original notice alleged the defendant lacked an SWPPP, and defendant then prepared an SWPPP after receiving the notice). *Long* does not control here, and Plaintiff was not required to send a new notice after Defendant developed its SWPPP.

### 3.    Speculative Claims

Lastly here, Defendant argues that claims in Plaintiff's Notice regarding water quality standards and unlawful discharge were "based on speculation and conjecture." Dkt. 155 at 35–36. For example, Defendant notes that Plaintiff "had no sampling whatsoever" when it alleged that stormwater discharges from the Facility contribute to violations of water quality standards. *Id.*

Whether allegations in a CWA notice are well supported by data is irrelevant, and a lack of supporting data would not undermine subject matter jurisdiction here. The point of the notice requirement is not to test the truth of the citizen-plaintiff's claims, but to provide "sufficient information to permit the recipient to identify" the alleged violations. 40 C.F.R. § 135.3(a).

Plaintiff has shown it has standing and that the Court has subject matter jurisdiction over this suit. This Court therefore **RECOMMENDS** that Defendant's Motion for Summary Judgment (Dkt. 155) be **DENIED**.

### C.    CWA Applicability and Defendant's Obligations

To win summary judgment on its CWA claims, Plaintiff must first show that Defendant indisputably discharges pollutants from a point source to navigable waters of the United States ("WOTUS") before the Court can determine whether Defendant discharged those pollutants

without a permit (or in violation of a permit). *California Coastkeeper All. v. Cosumnes Corp.*, No. 2:20-CV-1703 DB, 2023 WL 5280260, at *6 (E.D. Cal. Aug. 16, 2023).

### 1.    Waters of the United States

In *Sackett v. EPA*, the Supreme Court held that "the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water forming geographic[al] features that are described in ordinary parlance as streams, oceans, rivers, and lakes.'" 598 U.S. 651 (2023) (quoting *Rapanos v. U.S.*, 547 U.S. 715 (2006) (plurality opinion)). Soon after *Sackett*, the EPA revised the definition of WOTUS to include this "relatively permanent" standard throughout the regulation. *San Francisco Baykeeper v. City of Sunnyvale*, No. 5:20-CV-00824-EJD, 2023 WL 8587610, at *3 (N.D. Cal. Dec. 11, 2023) (citing 40 C.F.R. § 120.2). The EPA now defines WOTUS as:

> (1) territorial seas, interstate waters, or waters which are susceptible to use in interstate or foreign commerce including being tidally influenced;
> (2) impoundments of waters defined as WOTUS;
> (3) tributaries of waters defined as WOTUS under categories 1 and 2 that are relatively permanent, standing or continuously flowing bodies of water;
> (4) wetlands adjacent to waters defined as WOTUS under category 1, or adjacent to waters defined as WOTUS under categories 2 and 3 with a continuous surface connection to those waters; and
> (5) intrastate lakes and ponds that are relatively permanent, standing or continuously flowing bodies of water with a continuous surface connection to waters defined as WOTUS.

*Id.* The EPA also defines a list of things that are not WOTUS, such as ditches "excavated wholly in and draining only dry land that do not carry a relatively permanent flow of water[.]" 40 C.F.R. § 120.2(b).

Defendant does not dispute that the Snoqualmie River and the unnamed seasonal creek are WOTUS. Defendant instead argues that DP-1 and DP-2 discharge to, respectively,

engineered wetlands and a roadside ditch, neither of which constitute WOTUS. Dkt. 164 at 11–12; Dkt. 168 at 3–4.

Defendant's expert averred that he saw no evidence that water from the engineered wetland has a "continuous surface connection" to the nearby seasonal creek, such that the wetland would qualify as a water of the United States under the fourth category outlined above. *Id.* He noted that he did not personally see a discharge from the wetland to the creek during his December 2023 site visit, which was during the rainy season, and found the design of the wetland unlikely to create such a connection. *Id.* at 4.

Defendant's manager, Riley Carr, stated that he went to the engineered wetlands "at least a dozen times during rain events to see if there was discharge from the wetlands to the nearby unnamed seasonal creek" but "never observed a discharge from the wetlands to that creek/ditch or any other waterbody, even during periods of intense rainfall." Dkt. 167 at 3.

Both iterations of Defendant's own SWPPP, however, state that "Stormwater discharges from the Facility enter engineered wetlands to the east. *The engineered wetlands eventually discharge into an unnamed creek* (Unnamed Creek 1) to the east of the Facility which drains into a larger unnamed creek (Unnamed Creek 2) to the south which ultimately discharges to the Snoqualmie River." Dkt. 159 at 22 (emphasis added); Dkt. 150-2 at 16; *see* Dkt. 149-9 at 166 (ISGP application describing discharge as "wetlands to seasonal creek"); *see also* Dkt. 151-1 at 24 (Plaintiff's expert report noting "the banks above the wetland and stream are all quite steep" and the wetlands and stream "are connected").

The eastern edge of the wetlands is only about 30 to 75 feet away from the creek at any given point, a factor courts have found relevant in determining whether wetlands are WOTUS post-*Sackett*. Dkt. 150-4; *see United States v. Bobby Wolford Trucking & Salvage, Inc.*, No. C18-

0747 TSZ, 2023 WL 8528643, at *2 (W.D. Wash. Dec. 8, 2023) ("This case is not like *Rapanos*, in which the wetlands were a substantial distance (11 to 20 miles) away from traditional navigable waters. This case is also not like *Sackett*, in which the wetlands were near, but separated by a 30-foot road from, an unnamed tributary, which fed a non-navigable creek, which ran into Priest Lake, an intrastate (as opposed to interstate) body of water") (citations omitted).

In light of this evidence, the fact that Defendant's manager and expert did not witness a discharge and the expert's unexplained note that he considered "the design of the engineered wetland" do not create a material dispute of fact. Dkt. 168 at 3–4; Dkt. 167 at 3. The engineered wetland to which DP-1 discharges is indisputably a water of the United States. Even if it were not, Defendant offers no response to Plaintiff's evidence that the ditch to which DP-2 discharges flows into the nearby creek—separate grounds for CWA applicability. Dkt. 150-4; Dkt. 151-1 at 12, 63; *see* Dkt. 149-1 at 10 (Defendant's employee testifying that the ditch "probably" flows into the creek).

### 2.   Stormwater Associated with Industrial Activities

Plaintiff must also show that Defendant discharges pollutants—here, stormwater associated with industrial activities—into the engineered wetland or the nearby creek, which the Court found to be WOTUS. *Waste Action Project v. Snoqualmie Mill Ventures LLC*, No. C21-240 MJP, 2021 WL 4290427, at *4 (W.D. Wash. Sept. 21, 2021) (citing 40 C.F.R. § 122.26(b)(14)). "The Ninth Circuit has broadly interpreted the phrase 'associated with industrial activity' to require only an 'association with any type of industrial activity'—there is no separate provision requiring 'storm water [to] be contaminated or come into direct contact with pollutants.'" *Id.* (quoting *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 966 F.2d 1292, 1304 (9th Cir. 1992)).

1    Defendant also contests whether it has "always discharged stormwater associated with its

2    industrial activities" and argues that "there remains considerable uncertainty as to whether Girard

3    is even required to obtain a stormwater permit, because none of the ISGP's list of categories of

4    activities requiring coverage applies to Girard's activities." Dkt. 164 at 7–8 (citing Dkt. 166 at

5    23–24 ("I have not found what I believe to be an NAICS code or SIC code description that

6    adequately characterizes what Girard does at their facility.")).[10]

7    The record shows Ecology inspected the Facility in 2022 and advised Defendant to obtain

8    ISGP coverage because the Facility fell under NAICS code 562219. Dkt. 64-2 at 5. Defendant's

9    own records, including its ISGP permit application, certify under penalty of law that SIC code

10   1499 or NAICS code 562219 apply to the Facility. Dkt. 57-2 at 2, 5; Dkt. 149-9 at 67–68; Dkt.

11   166 at 92. Defendant's manager testified that he believed NAICS code 562219 correctly applied

12   to operations at the Facility. Dkt. 149-9 at 11. These codes require ISGP permit coverage. 40

13   C.F.R. § 122.26(b)(14)(iii) (SIC codes 10 through 14 require coverage); Dkt. 14-4 at 13 (NAICS

14   group 562 requires coverage).

15   The Court is not persuaded by Defendant's attempts to impugn its own certified

16   statements to Ecology and the public. *See San Francisco Baykeeper v. W. Bay Sanitary Dist.*,

17   791 F. Supp. 2d 719, 755 (N.D. Cal. 2011) ("A defendant may not impeach its own publicly filed

18   reports which are 'submitted under penalty of perjury'") (quoting *Save Our Bays & Beaches v.*

19   *City & Cnty. of Honolulu*, 904 F. Supp. 1098, 1138 (D. Haw. 1994) (defendant bound by

20   statements of noncompliance with NPDES permit)). Defendant's contentions prove especially

21   futile where its own witnesses later testified as to the accuracy of those submissions.

22

23   [10] NAICS and SIC codes are categorizations of activities, some of which automatically constitute "industrial
     activities" requiring NPDES coverage for stormwater discharges pursuant to 40 C.F.R. § 122.26. *See, e.g.*, Dkt. 14-4
24   at 12–13 (ISGP table listing NAICS codes requiring permit coverage).

REPORT AND RECOMMENDATION - 29

1    Thus, the Court finds no genuine dispute of material fact that Defendant has discharged a

2    pollutant (stormwater associated with industrial activities) to Waters of the United States. The

3    Court must now determine whether Defendant did so without a permit (or in violation of one).

4    **D.    Pre-Permit Claims**

5    The parties agree that Defendant did not have ISGP coverage until March 2, 2023. Dkt.

6    164 at 5; Dkt. 149 at 20. The Court must therefore determine how many discharges from the

7    Facility (and thus, CWA violations) occurred prior to that date.

8    Plaintiff argues that Defendant has indisputably discharged stormwater at least once per

9    calendar quarter between February 1, 2016, and March 2, 2023—29 unpermitted discharges.

10   Dkt. 149 at 11. This Court agrees.

11   Defendant's expert testified that the Facility has more likely than not discharged at least

12   once per quarter, going back as far as the Facility was in operation. Dkt. 149-8 at 42. Riley Carr

13   testified that the Facility has discharged water since he began working there in 2014. Dkt. 149-9

14   at 28–29. Since Defendant began sampling pursuant to its ISGP requirements in 2023, it

15   collected samples of offsite discharges in each of the three quarters it was monitoring. Dkt. 149-

16   4; *see* Dkt. 149-8 at 80–82 (Defendant's expert testifying that, because there was enough rainfall

17   to collect a sample in the first, second and third quarter—the third quarter typically being the

18   driest of the year—there was likely enough rainfall to collect a sample in the first quarter as

19   well). Plaintiff further notes that recent changes to topography have only made discharges *less*

20   frequent. Dkt. 149 at 13; Dkt. 149-8 at 84 (addition of check dams and pond "decrease[d] the

21   number of discharges anticipated").

22   Aside from arguments already discussed above (*e.g.*, that Defendant does not discharge

23   pollutants or that no permit is required), Defendant does not contest the frequency of discharges

24

argued by Plaintiff. The Court therefore finds no genuine issue of material fact that Defendant violated the CWA 29 times by discharging pollutants without a permit once per calendar quarter, from February 1, 2016, until it obtained ISGP coverage on March 2, 2023.

## E.    Post-Permit Claims

The parties agree that Defendant obtained ISGP coverage on March 2, 2023. Dkt. 164 at 5; Dkt. 149 at 20. The parties disagree as to whether Defendant complied with requirements of its ISGP after that date. Dkt. 164 at 2; Dkt. 149 at 20–36. Plaintiff must simply show that Defendant indisputably violated the terms of its ISGP. Good faith, impossibility, ignorance, and *de minimus* effects are no defense to a violation. *San Francisco Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1102, 1108 (N.D. Cal. 2022), *reconsideration denied*, No. 5:20-CV-00824-EJD, 2023 WL 8587610 (N.D. Cal. Dec. 11, 2023).

### 1.    SWPPP Deficiencies

A compliant SWPPP is required by the ISGP and has two major objectives: (1) to identify and evaluate sources of pollutants, and (2) to identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. *Santa Monica Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F. Supp. 2d 936, 941 (C.D. Cal. 2009).

Defendant prepared an SWPPP on July 20, 2023 (the "First SWPPP"). Dkt. 159 at 8–213. Defendant updated its SWPPP on December 8, 2023 (the "Second SWPPP"). Dkt. 150-2. Plaintiff alleges three categories of SWPPP violations: (1) Defendant's lack of any SWPPP from March 3, 2023, through July 19, 2023; (2) deficiencies in the First SWPPP; and (3) deficiencies in the Second SWPPP. Dkt. 149 at 21–27. Plaintiff asserts that "each day an ISGP-permittee fail[s] to maintain a compliant SWPPP constitutes a separate violation of the CWA." *Id*. at 20

1  (citing *Puget Soundkeeper All. v. Rainier Petroleum Corp.*, 138 F. Supp. 3d 1170, 1182-83

2  (W.D. Wash. 2015)).

3          a.          **Failure to Prepare any SWPPP between March 3, 2023, and July 19,**

4                      **2023**

5          Plaintiff asserts that the ISGP required Defendant to have a compliant SWPPP

6  immediately upon ISGP coverage. Dkt. 149 at 21 (citing 149-7 at 13) (Defendant's expert

7  testifying that he believes permittees are required to have an SWPPP "immediately.").

8          Defendant responds that "there is no ISGP requirement to implement a SWPPP

9  'immediately' after obtaining coverage." Dkt. 162 at 19. Defendant notes that the ISGP contains

10 no such requirement and only requires the permittee to produce ISGP documents (including the

11 SWPPP) within 14 days upon request by Ecology or the public. *Id.* (citing Dkt. 14-4 at 52).

12         In its Reply, Plaintiff points to language in the ISGP that even "applicants for coverage"

13 must have and implement an SWPPP, in addition to permittees. Dkt. 170 at 2 (citing Dkt. 14-4 at

14 20). The Court finds that such language requires immediate SWPPP compliance. Defendant's

15 interpretation relies on the lack of an explicit deadline in the ISGP, an unnecessary inclusion

16 where ISGP coverage requires a compliant SWPPP to begin with. Defendant's interpretation is

17 also questionable because it implies that an existing, deficient SWPPP is violative, but an

18 entirely nonexistent SWPPP is not, creating a perverse incentive for permittees to avoid

19 developing an SWPPP altogether.

20         The parties do not dispute that Defendant did not have an SWPPP for 138 days between

21 March 3, 2023, and July 19, 2023. Because the ISGP requires Defendant to implement a

22 compliant SWPPP immediately upon coverage, each day without an SWPPP constitutes a

23 violation by Defendant of its ISGP obligations (and, by extension, the CWA).

24

           **b.**     **Deficient SWPPP between July 20, 2023, and December 7, 2023**

Plaintiff alleges the following deficiencies in Defendant's First SWPPP site map:

(1)      The map does not identify the location and extent of all impervious surfaces, as required by Condition S3.B.1.c;

(2)      The map does not identify the locations of all structural source control BMPs, as required by Condition S3.B.1.e;

(3)      The map does not identify all "drainage ditches" in the vicinity of the facility, as required by Condition S3.B.1.f;

(4)      The map does not provide the locations of all onsite stormwater conveyances including ditches and ponds, as required by Condition S3.B.1.i;

(5)      The map does not provide the locations of actual and potential pollutant sources, as required by Condition S3.B.1.j; and

(6)      The map provides an incorrect location for sample point DP-2, as required by Condition S3.B.1.k.

Dkt. 149 at 22–24. Plaintiff argues that it need only prove a single violation to be entitled to summary judgment for each day the First SWPPP was noncompliant. Dkt. 149 at 122.

      Several of these violations are uncontested. First, the map does not indicate structural source control[11] BMPs, and merely notes above the legend that "structural source control BMPs visible in the imagery on this map include grading and berming. Structural source control BMP activities that are conducted intermittently as needed in various locations, such as erosion and sediment control practices, are not specifically shown on this map." Dkt. 150-3. None of the

---

[11] Structural source controls are physical or mechanical devices that isolate pollutants from contact with precipitation or runoff to avoid their entering stormwater at all. Dkt. 151-1 at 28; Dkt. 14-4 at 71.

1    BMPs are indicated on the map itself. The experts from both parties agree that Defendant's

2    failure to indicate these BMPs, such as the berm along the northeast boundary of the Facility,

3    violates the ISGP. Dkt. 151-2 at 8; Dkt. 149-8 at 45–46. Defendant's contention that its broad

4    note was a sufficient indication does not create a dispute of material fact.

5         Second, the map does not identify actual and potential pollutant sources. Dkt. 150-3. For

6    example, Plaintiff's expert averred that dumping slurry waste is a pollutive activity that raises the

7    pH of water. Dkt. 151 at 10–11; Dkt. 151 at 15. As another example, the First SWPPP itself lists

8    broken concrete piles as a source of pollutants. Dkt. 150-1 at 12. Defendant does not contest that

9    either of these are actual or potential pollutant sources that should have been indicated on the

10   map.

11        Third, the map provides an incorrect location for Defendant's designated sample point

12   DP-2. *Compare* Dkt. 150-3 *with* Dkt. 150-4. Defendant's manager, Riley Carr, testified that the

13   location of DP-2 on the map was incorrect and should have been "further down towards the

14   entrance of the driveway." Dkt. 149-9 at 37. Defendant does not contest the proper location of

15   DP-2 and remedied the issue in its Second SWPPP. Dkt. 150-4.

16        Plaintiff has demonstrated multiple uncontested site map violations in Defendant's First

17   SWPPP. A faulty site map is a violation of the ISGP and CWA upon which courts routinely

18   grant summary judgment. *See Port of Olympia*, No. C17-5445 BHS, 2019 WL 6215281, at *6

19   (even "de minimus" site map errors constitute CWA violations). Defendant violated the CWA

20   once for each of the 140 days the First SWPPP remained in effect.

21   //

22   //

23

24

1

### c.    Deficient SWPPP between December 8, 2023, and Present

2    Plaintiff alleges the following deficiencies remain in Defendant's Second SWPPP:

3        (1)    The site map provides incorrect information related to the DP-1 drainage basin

4              limits,[12] and lacks stormwater flow arrows, as required by Condition S3.B.1.d;

5        (2)    Descriptions and frequencies of BMPs selected for the Facility, as required by

6              Condition S3.B.4.a, are vague or inaccurate; and

7        (3)    The SWPPP does not identify discharges from, or include BMPs for, the slurry

8              processing embankment.[13]

9    Dkt. 149 at 24–27; Dkt. 151 at 6. Because of the vagueness of Condition S3.B.1.d, this Court

10    agrees with Defendant that there is a dispute of material fact as to whether the Second SWPPP

11    includes adequate stormwater flow arrows. *See* Dkt. 164 at 33 (noting that S3.B.1.d does not

12    mandate a certain number of arrows or even require inclusion of "all" flow arrows).

13        At minimum, however, Defendant admits that the second SWPPP "includes some

14    incorrect information related to the DP-1 drainage limits," which "should have been marked

15    along the top of [the] berm forming the southeastern ISGP boundary limits, which also should

16    have been delineated on the SWPPP map." Dkt. 168 at 4; Dkt. 164 at 30–31. Defendant's expert

17    also states that "no industrial activity as defined by the ISGP is conducted in the area between

18    the southeastern berm ridge and southeastern lease boundary, and therefore, the area is not

19    required to be further characterized." Dkt. 168 at 4. While this fact may save Defendant from

20    details like stormwater arrows, the admitted flaws related to the DP-1 drainage limits are

21    sufficient to establish a violation.

22

---

23    [12] Marked by the solid orange line on the site map. *See* Dkt. 150-4.

24    [13] Claims regarding the slurry processing embankment which are unrelated to Defendant's SWPPP are discussed in the next section. *See infra* Section V.E.2.

1       The Court has reviewed the parties' remaining arguments with respect to the Second

2   SWPPP but declines to address them as it has already determined that the Second SWPPP

3   includes incorrect information. Defendant violated the CWA once for each day (203 days) the

4   Second SWPPP remained in effect prior to Plaintiff's Motion for Partial Summary Judgment.

5       **2.      Slurry Processing Embankment**

6       Plaintiff alleges violations with respect to the slurry processing embankment, which sits

7   east of the Facility's slurry processing area, between it and the nearby creek. Dkt. 149 at 27–31.

8   In opposition, Defendant argues that the cementitious slurry operation is covered by its State

9   Waste Discharge Permit ("SWDP") which imposes its own discharge limits, monitoring and

10  reporting requirements, prohibitions on certain discharges, BMPs, a spill control plan, and solid

11  waste control plan. Dkt. 164 at 27–28 (citing Dkt. 166 at 90–92). SWDP violations are issues of

12  state law and grounds for an enforcement action by Ecology. *Id.* at 111; Dkt. 168 at 6–7. Indeed,

13  Defendant contests that some of the violations alleged by Plaintiff were actions required by the

14  SWDP. Dkt. 164 at 29.

15      The ISGP excludes activities covered by "an existing NPDES or other general permit."

16  Dkt. 14-4 at 16. The parties agree that the SWDP is *not* an NPDES permit. Dkt. 164 at 26; Dkt.

17  170 at 8. Defendant's expert testified that stormwater discharges east of the slurry operation are

18  "under the purview of the ISGP." Dkt. 149-8 at 55. This is consistent with the purpose of the

19  SWDP, which is to regulate slurry wastewater discharged by Defendant to the sewer system,

20  rather than stormwater collecting on the surface of the Facility. Dkt. 166 at 95. And as Plaintiff

21  notes, the Ninth Circuit recently clarified that ISGP coverage applies to an entire facility,

22  including areas where no industrial activities occur. *Soundkeeper v. Port of Tacoma*, No. 21-

23

24

35881, 2023 WL 11807235, at *1 (9th Cir. June 10, 2024). Thus, the ISGP governs stormwater discharges on the slurry processing embankment.

Plaintiff asserts two categories of violations related to the slurry processing embankment. First, Plaintiff argues that Defendant failed to collect stormwater samples and submit DMRs for the embankment for each quarter since it obtained the ISGP. Dkt. 149 at 32. According to Plaintiff, this constitutes two violations each quarter—one for failing to collect samples, and one for failing to submit a DMR—a total of eight violations. *Id.*

Second, Plaintiff argues that Defendant has failed to implement stormwater BMPs on the embankment, including all known, available, and reasonable methods of prevention, control and treatment ("AKART"). *Id.* at 32–33. Dkt. 170 at 8. Of particular concern to Plaintiff is evidence that Defendant took solid waste from the slurry processing operation outside of containment and dumped it on a topsoil pile that Defendant sells to customers. Dkt. 151 at 10–12; Dkt. 170 at 10. According to Plaintiff, Defendant committed one CWA violation for each day (483 days) that the requisite BMPs were not implemented and a single separate violation for the improper disposal of slurry solid waste. Dkt. 149 at 32, 36.

Beyond pointing to its SWDP, which the Court finds does not apply here, Defendant does not contest these violations. Dkt. 164 at 26–30. Because there is no dispute of material fact, the Court finds a total of 492 violations of the CWA related to the slurry processing embankment.

### 3.    BMP Deficiencies

Plaintiff alleges CWA violations with respect to Defendant's failure to implement certain mandatory BMPs under Condition S3.B.4.b. Dkt. 149 at 33–36; Dkt. 14-4 at 23–27. Plaintiff asserts Defendant is responsible for one violation each day after it obtained its ISGP (on March 2, 2023) that it did not incorporate a given BMP. Dkt. 149 at 36; Dkt. 149-1 at 5–6.

1          First, Plaintiff alleges (1) a lack of erosion and sediment control BMPs and (2) a lack of

2    BMPs to prevent the use of process slurry water as a dust suppressant. Dkt. 149 at 33–34.

3    Plaintiff concedes that Defendant began incorporating the required BMPs on June 5, 2023, but

4    alleges 94 days of violations for each of these two BMPs prior to that date—188 violations in

5    total. *Id.*; *see* Dkt. 149-8 at 18–20 (Defendant's expert admitting that erosion and sediment

6    control BMPs were lacking, "erosive soils that clearly were running off into ditches" causing

7    potential discharge locations beyond DP-1 and DP-2, and an absence of matting, straw wattles,

8    or gravel berms that could have been implemented); *Id.* at 23–24 (Defendant sprayed processed

9    slurry water as a dust suppressant until Defendant's expert "told them that they needed to stop

10   doing that.").

11         Second, Plaintiff alleges Defendant failed to keep dumpsters under cover or fit them with

12   a storm-resistant lid until at least July 24, 2023, 143 violations in total. Dkt. 149 at 34; *see* Dkt.

13   151-1 at 57; Dkt. 153-2 at 5 (images of yellow dumpster with metal protruding from its open top,

14   taken on May 15, 2023, and July 24, 2023); Dkt. 168 at 20 (Defendant's expert listing the

15   dumpster as a rectified non-compliance issue, noting "the metal dumpster previously present has

16   been removed").

17         Third, Plaintiff alleges continuing violations for Defendant's failure to implement BMPs

18   to prevent track-out from its vehicles onto the public road, 483 violations in total. Dkt. 149 at 35;

19   Dkt. 149-8 at 50 (Defendant's expert admitting that Defendant should use a "properly designed

20   wheel wash [. . .] or some other BMP" to prevent track-out, but does not do so, and that the

21   "track-out issue needs to be addressed"); Dkt. 149-3 at 20–21 (Thomas Holmes, the City's

22   Wastewater Superintendent, testifying that Defendant once had an inadequate and "half-assed"

23   wheel wash to prevent track-out, but had since stopped the practice altogether).

24

Finally, Plaintiff alleges a single violation where Defendant allowed a large volume of highly turbid water to discharge to the wetland and stream. Dkt. 149 at 34; *see* Dkt. 150-13; Dkt. 151 at 12–13; (images and video of flowing muddy water, which, according to Plaintiff's expert, "would have exceeded the ISGP's turbidity and total suspended solids benchmarks and caused visible cloudiness in the receiving waters").

Defendant only contests violations related to the scrap metal dumpsters, noting that the photograph taken by Russell on July 24, 2023, "lacks any detail to show that the dumpster in fact lacked a lid." Dkt. 164 at 34 (citing Dkt. 153-2 at 5). Defendant further notes that "substantial changes" were made to the Facility in June 2023, implying that a lid could have been added to the dumpster after Plaintiff's expert took a photo of the open dumpster on May 15, 2023. *Id.* at 33–34 (citing Dkt. 151-1 at 57).

While the parties agree that Defendant rectified some violations on or around June 5, 2023, the record indicates that the dumpster was not covered prior to Russell's July 24, 2023, photograph. Russell's photo, while imperfect, clearly depicts pieces of metal sticking out of the top of the dumpster of a similar appearance and position to those in the close-up photo taken May 15, 2023. *Compare* Dkt. 153-2 at 5 *with* Dkt. 151-1 at 57.

Defendant's evidence does not adequately challenge this conclusion to generate a material fact dispute concerning the scrap dumpster. Riley Carr testified that he could not remember if there was ever a lid for the dumpster, but that it was removed from the site at some point. Dkt. 149-9 at 44–46. Defendant's expert testified that the dumpster was removed before November 28, 2023, but did not say whether it ever had a cover. Dkt. 149-8 at 21, 64. Although the Court must draw all reasonable inferences in Defendant's favor, such facts do not provide "a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving

party." *Koch v. Infosys, Ltd.*, No. C14-1649RSL, 2015 WL 8328067, at *1 (W.D. Wash. Dec. 9, 2015) (citing *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008)). "The mere existence of a scintilla of evidence" is insufficient to defeat a motion for summary judgment—the nonmoving party "must present probative evidence in support of its claim or defense." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 323.

Plaintiff has shown, and Defendant has failed to respond to, evidence of several BMP violations by Defendant. Defendant indisputably violated the CWA once for each day after it obtained its ISGP on March 2, 2023, and did not incorporate:

(1)   Erosion and sediment control BMPs until June 5, 2023 (94 days);

(2)   BMPs preventing the use of slurry water as a dust suppressant until June 5, 2023 (94 days);

(3)   BMPs to keep dumpsters under cover or fit with a storm-resistant lid until July 24, 2023 (143 days);

(4)   BMPs to prevent track-out until Plaintiff filed the present Motion on June 28, 2024 (483 days); and

(5)   BMPs to prevent a single discharge of highly turbid water (1 day).

//

//

//

//

//

//

1

## V.    CONCLUSION

2      For the reasons set forth above, the undersigned recommends that Defendant's Motion

3  for Summary Judgment (Dkt. 155) be **DENIED** and that Plaintiff's Motion for Partial Summary

4  Judgment (Dkt. 149) be **GRANTED**. The Court further finds that Defendant violated the CWA

5  as set forth in the attached Proposed Order.[14]

6      Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), the parties

7  shall have twenty-one (21) days from service of this report to file written objections. *See also*

8  Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes

9  of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver

10  of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985);

11  *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating

12  the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

13  September 25, 2024, as noted in the caption.

14      Dated this 4th day of September, 2024.

15

16

17      Grady J. Leupold
       United States Magistrate Judge

18

19

20

21

22

23  ---

[14] A total count of 1,334 violations. Dkt. 149 at 44; Dkt. 149-1 at 6. Defendant's failure to implement BMPs on the slurry processing embankment is likely omitted from this number, as these 483 violations ostensibly overlap with other violations of Condition S3 which are already included in the total.

24